A(=

CERTIFIED COPY

In the

**United States Court of Appeals**
**For the Seventh Circuit**

*FILED*

No. 01-4155

MARGARET L. HOSTY, JENI S. PORCHE,
and STEVEN P. BARBA,

*JUL 1 2 2005*

*MICHAEL W. DOBBINS*
*CLERK, U.S. DISTRICT COURT*

*Plaintiffs-Appellees,*

*v.*

PATRICIA CARTER,

*Defendant-Appellant,*

*and*

GOVERNORS STATE UNIVERSITY, *et al.*,

*Defendants.*

---

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 01 C 500—**Suzanne B. Conlon**, *Judge.*

---

ARGUED JANUARY 7, 2003—DECIDED APRIL 10, 2003
REARGUED EN BANC JANUARY 8, 2004—DECIDED JUNE 20, 2005

---

Before FLAUM, *Chief Judge*, and POSNER, COFFEY, EASTERBROOK, RIPPLE, MANION, KANNE, ROVNER, WOOD, EVANS, and WILLIAMS, *Circuit Judges*.[†]

EASTERBROOK, *Circuit Judge*.   Controversy began to swirl when Jeni Porche became editor in chief of the *Innovator*, the student newspaper at Governors State University. None of the articles concerned the apostrophe missing from the University's name. Instead the students tackled meatier fare, such as its decision not to renew the teaching contract of Geoffrey de Laforcade, the paper's faculty adviser.

I

After articles bearing Margaret Hosty's by-line attacked the integrity of Roger K. Oden, Dean of the College of Arts and Sciences, the University's administration began to take intense interest in the paper. (Here, and in Part II of this opinion as well, we relate matters in the light most favorable to the plaintiffs.) Both Oden and Stuart Fagan (the University's President) issued statements accusing the *Innovator* of irresponsible and defamatory journalism. When the *Innovator* declined to accept the administration's view of its duties—in particular, the paper refused to retract factual statements that the administration deemed false, or even to print the administration's responses— Patricia Carter, Dean of Student Affairs and Services, called the *Innovator*'s printer and told it not to print any issues that she had not reviewed and approved in advance. The printer was not willing to take the risk that it would

---

[†]  Circuit Judge Sykes, who joined the court after the oral argument, did not participate in the consideration or decision of this case.

not be paid (the paper relies on student activity funds), and the editorial staff was unwilling to submit to prior review. Publication ceased in November 2000. The paper has since resumed publication under new management; Porche, Hosty, and Steven Barba, another of the paper's reporters, have continued the debate in court, suing the University, all of its trustees, most of its administrators, and several of its staff members for damages under 42 U.S.C. § 1983.

Defendants moved for summary judgment, and the district court granted the motion with respect to all except Dean Carter. 2001 U.S. Dist. LEXIS 18873 (N.D. Ill. Nov. 13, 2001); see also 174 F. Supp. 2d 782 (N.D. Ill. 2001). Some defendants prevailed because, in the district judge's view, they had not done anything wrong (or, indeed, anything at all, and §1983 does not create vicarious liability); others received qualified immunity. As for Carter, however, the judge thought that the evidence could support a conclusion that threatening to withdraw the *Innovator*'s financial support violated the first amendment to the Constitution (applied to the University, as a unit of state government in Illinois, through the fourteenth). Although *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), holds that faculty may supervise and determine the content of a student newspaper, the district court thought that decision limited to papers published by high school students as part of course work and inapplicable to student newspapers edited by college students as extracurricular activities—and the judge added that these distinctions are so clearly established that no reasonable person in Carter's position could have thought herself entitled to pull the plug on the *Innovator*. Carter took an interlocutory appeal to pursue her claim of qualified immunity. See *Behrens v. Pelletier*, 516 U.S. 299 (1996). A panel of this court

affirmed, 325 F.3d 945 (2003), and we granted Carter's petition for rehearing en banc.

When entertaining an interlocutory appeal by a public official who seeks the shelter of qualified immunity, the threshold question is: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the [public official's] conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). See also, e.g., *Brosseau v. Haugen*, 125 S. Ct. 596, 598 (2004); *Newsome v. McCabe*, 319 F.3d 301, 303-04 (7th Cir. 2003). Only if the answer is affirmative does the court inquire whether the official enjoys qualified immunity. "[I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Saucier*, 533 U.S. at 201. We address the issues in the order *Saucier* specifies: the existence of a constitutional claim in Part II and immunity in Part III.

## II

### A

*Hazelwood* provides our starting point. A high school's principal blocked the student newspaper (which was financed by public funds as part of a journalism class) from publishing articles that the principal thought inappropriate for some of the school's younger students and a potential invasion of others' privacy. When evaluating the students' argument that the principal had violated their right to freedom of speech, the Court first asked whether the paper was a public forum. 484 U.S. at 267-70. After giving a negative answer based on the school's established policy of supervising the writing and reviewing the content of each issue, the Court observed that the school's sub-

vention of the paper's costs distinguished the situation from one in which students were speaking independently, as in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969). When a school regulates speech for which it also pays, the Court held, the appropriate question is whether the "actions are reasonably related to legitimate pedagogical concerns." 484 U.S. at 273. "Legitimate" concerns, the Court stated, include setting "high standards for the student speech that is disseminated under its auspices—standards that may be higher than those demanded by some newspaper publishers or theatrical producers in the 'real' world—and [the school] may refuse to disseminate student speech that does not meet those standards. In addition, a school must be able to take into account the emotional maturity of the intended audience in determining whether to disseminate student speech on potentially sensitive topics, which might range from the existence of Santa Claus in an elementary school setting to the particulars of teenage sexual activity in a high school setting." *Id.* at 271-72. Shortly after this passage the Court dropped a footnote: "A number of lower federal courts have similarly recognized that educators' decisions with regard to the content of school-sponsored newspapers, dramatic productions, and other expressive activities are entitled to substantial deference. We need not now decide whether the same degree of deference is appropriate with respect to school-sponsored expressive activities at the college and university level." *Id.* at 273-74 n.7 (citations omitted).

Picking up on this footnote, plaintiffs argue, and the district court held, that *Hazelwood* is inapplicable to university newspapers and that post-secondary educators therefore cannot ever insist that student newspapers be submitted for review and approval. Yet this footnote does not even hint at the possibility of an on/off switch: high school papers reviewable, college papers not reviewable.

It addresses degrees of deference. Whether *some* review is possible depends on the answer to the public-forum question, which does not (automatically) vary with the speakers' age. Only when courts need assess the reasonableness of the asserted pedagogical justification in non-public-forum situations does age come into play, and in a way suggested by the passage we have quoted from *Hazelwood*'s text. To the extent that the justification for editorial control depends on the audience's maturity, the difference between high school and university students may be important. (Not that any line could be bright; many high school seniors are older than some college freshmen, and junior colleges are similar to many high schools.) To the extent that the justification depends on other matters—not only the desire to ensure "high standards for the student speech that is disseminated under [the school's] auspices" (the Court particularly mentioned "speech that is . . . ungrammatical, poorly written, inadequately researched, biased or prejudiced, vulgar or profane, or unsuitable for immature audiences", 484 U.S. at 271) but also the goal of dissociating the school from "any position other than neutrality on matters of political controversy", *id.* at 272—there is no sharp difference between high school and college papers.

The Supreme Court itself has established that age does not control the public-forum question. See generally *Symposium: Do Children Have the Same First Amendment Rights As Adults?*, 79 Chi.-Kent L. Rev. 3-313 (2004) (including many articles collecting and discussing these decisions). So much is clear not only from decisions such as *Tinker*, which held that public school students have a right of non-disruptive personal expression on school premises, but also from the decisions concerning the use of school funds and premises for religious expression. See, e.g., *Lamb's Chapel v. Center Moriches Union Free School*

*District,* 508 U.S. 384 (1993); *Rosenberger v. Rector and Visitors of the University of Virginia,* 515 U.S. 819 (1995); *Good News Club v. Milford Central School,* 533 U.S. 98 (2001). See also *Hedges v. Wauconda Community Unit School District No. 118,* 9 F.3d 1295 (7th Cir. 1993). These decisions hold that no public school, of any level—primary, secondary, or post-secondary—may discriminate against religious speech in a public forum (including classrooms made available to extracurricular activities), or withhold funding that would be available to student groups espousing sectarian views. *Good News Club,* which dealt with student clubs in an elementary school, deemed dispositive (533 U.S. at 110) a decision about the first amendment rights of college students. Having opened its premises to student clubs, and thus created a limited-purpose public forum, even an elementary school could not supervise or censor the views expressed at a meeting of the Good News Club.

If private speech in a public forum is off-limits to regulation even when that forum is a classroom of an elementary school (the holding of *Good News Club*) then speech at a non-public forum, and underwritten at public expense, may be open to reasonable regulation even at the college level—or later, as *Rust v. Sullivan,* 500 U.S. 173 (1991), shows by holding that the federal government may insist that physicians use grant funds only for the kind of speech required by the granting authority. Cf. *National Endowment for the Arts v. Finley,* 524 U.S. 569 (1998). We hold, therefore, that *Hazelwood*'s framework applies to subsidized student newspapers at colleges as well as elementary and secondary schools. See also *Axson-Flynn v. Johnson,* 356 F.3d 1277 (10th Cir. 2004) (*Hazelwood* supplies the framework for evaluating collegiate speech and allows regulation when the speech is connected to the curriculum); *Bishop v. Aronov,* 926 F.2d 1066 (11th Cir. 1991)

(*Hazelwood* supplies the framework for evaluating collegiate speech and allows regulation when readers might infer the school's approval).

## B

*Hazelwood*'s first question therefore remains our principal question as well: was the reporter a speaker in a public forum (no censorship allowed?) or did the University either create a non-public forum or publish the paper itself (a closed forum where content may be supervised)? Plaintiffs contend, and the district court agreed, that the Court found a public forum missing in *Hazelwood* only because the paper was prepared as part of the journalism curriculum. By contrast, the *Innovator* was an extracurricular activity, and thus beyond all control, the district court concluded. Yet if the Constitution establishes a bright line between curricular activities and all other speech, then decisions such as *Rust* and *Finley* are inexplicable, for they hold that speakers who have completed their education still must abide by the conditions attached to public subsidies of speech and other expressive activities. See also Robert C. Post, *Subsidized Speech*, 106 Yale L.J. 151 (1996).

Suppose the University had given the *Innovator* $10,000 to publish a semester's worth of newspapers, and Porche then had decided that the students would get more benefit from a booklet describing campus life and cultural activities in the surrounding neighborhoods. Both paper and booklet are forms of speech, but the fact that the publication was not part of the University's curriculum and did not carry academic credit would not have allowed Porche to divert the money from one kind of speech to the other.

Or suppose that the publication in question were one under the University's direct management—say, its alumni magazine. If the University offered course credit to journalism students who prepared a publishable puff piece, the right to control would be evident. The University, after all, is the alumni magazine's publisher; the contents are *its* speech; units of state and local government are entitled to speak for themselves. See *Johanns v. Livestock Marketing Ass'n*, No. 03-1164 (U.S. May 23, 2005), slip op. 6-8; *University of Wisconsin v. Southworth*, 529 U.S. 217, 229 (2000); *Keller v. State Bar*, 496 U.S. 1, 12-13 (1990). That institutions can speak only through agents does not allow the agents to assume control and insist that submissions graded D-minus appear under the University's masthead. *Livestock Marketing Ass'n* has dispelled all doubt on that score.

Now take away the course credit and assume that the alumni magazine hires students as stringers and pays by the word for any articles accepted and printed. The University would remain the operator of this non-public forum and could pick and choose from among the submissions, printing only those that best expressed the University's own viewpoint. Thus although, as in *Hazelwood*, being part of the curriculum may be a *sufficient* condition of a non-public forum, it is not a *necessary* condition. Extracurricular activities may be outside any public forum, as our alumni-magazine example demonstrates, without also falling outside all university governance. Let us not forget that academic freedom includes the authority of the university to manage an academic community and evaluate teaching and scholarship free from interference by other units of government, including the courts. See *University of Pennsylvania v. EEOC*, 493 U.S. 182 (1990); *University of Michigan v. Ewing*, 474 U.S. 214 (1985); *Southworth*, 529 U.S. at 237-39 (Souter, J., concurring).

## C

What, then, was the status of the *Innovator*? Did the University establish a public forum? Or did it hedge the funding with controls that left the University itself as the newspaper's publisher? If the paper operated in a public forum, the University could not vet its contents. See *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975). But if underwritten student publications at Governors State University are a non-public forum, then it becomes important whether Dean Carter had legitimate pedagogical reasons for her action. We do not think it possible on this record to determine what kind of forum the University established or evaluate Dean Carter's justifications. But the question posed by *Saucier* is not who wins in the end, but whether the evidence makes out a constitutional claim when taken in the light most favorable to the plaintiff. These facts would permit a reasonable trier of fact to conclude that the *Innovator* operated in a public forum and thus was beyond the control of the University's administration.

The *Innovator* did not participate in a traditional public forum. Freedom of speech does not imply that someone else must pay. The University does not hand out money to everyone who asks. But by establishing a subsidized student newspaper the University may have created a venue that goes by the name "designated public forum" or "limited-purpose public forum". See *United States v. American Library Association*, 534 U.S. 194 (2003); *United States v. Kokinda*, 497 U.S. 720 (1990); *Perry Education Association v. Perry Local Educators' Association*, 460 U.S. 37 (1983). Participants in such a forum, declared open to speech *ex ante*, may not be censored *ex post* when the sponsor decides that particular speech is unwelcome. The classrooms used for meetings in *Good News Club* were designated public

forums, and because the school allowed any student group
to use the space the Court held that it could not forbid
religious speech. In the same way, a school may declare the
pages of the student newspaper open for expression and
thus disable itself from engaging in viewpoint or content
discrimination while the terms on which the forum operates
remain unaltered. Dean Carter did not purport to alter the
terms on which the *Innovator* operated; that authority
belonged to the Student Communications Media Board. And
the rules laid down by the Board, though ambiguous, could
be thought (when considered as favorably to plaintiffs as the
record allows) to create a designated public forum.

Defendants concede that the Board is the publisher of
the *Innovator* and other subsidized print and broadcast
media. The Board has seven members, all chosen by the
Student Senate: four students, two faculty members, and
one "civil service or support unit employee of the univer-
sity." The Board determines how many publications it will
underwrite (subject to the availability of funds, which as
in *Southworth* and *Rosenberger* come from student activi-
ties fees), and the general character of each. It appoints
"for the period of one year, the head of each student media
staff." The Board's policy is that each funded publication
"will determine content and format . . . without censorship
or advance approval". If this is all there is to it, then the
*Innovator* is in the same position as the student speakers
in *Southworth* and *Rosenberger*: a designated public forum
has been established, and the faculty cannot censor speech
within it. When viewing matters in the light most favor-
able to the students, we stop here, because other matters
are cloudy.

Two things have the potential to cast matters in a dif-
ferent light if a trial were to occur. One is that the Board's
charter provides that it is "responsible to the Director of

Student Life." Perhaps the Director of Student Life (who appears to be one of Dean Carter's subordinates) has established criteria for subsidized student publications. None is in the record, however, so this possibility does not matter. The other is that each funded publication has a faculty adviser. The parties disagree not only about who the adviser was at the critical time (plaintiffs say that de Laforcade remained their adviser even after he left the University's faculty; Carter insists that a different person filled that position) but also about whether the adviser just offers advice (plaintiffs' view) or exercises some control (Carter's view). Because the district court acted on a motion for summary judgment, it assumed (as do we) that plaintiffs' perspective is the correct one. On that understanding, the Board established the *Innovator* in a designated public forum, where the editors were empowered to make their own decisions, wise or foolish, without fear that the administration would stop the presses.

## III

Qualified immunity nonetheless protects Dean Carter from personal liability unless it should have been "clear to a reasonable [public official] that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. "This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition". *Id.* at 201. See also, e.g., *Wilson v. Layne*, 526 U.S. 603, 614-18 (1999); *Anderson v. Creighton*, 483 U.S. 635 (1987); *Greenberg v. Kmetko*, 840 F.2d 467 (7th Cir. 1988) (en banc). One might well say as a "broad general proposition" something like "public officials may not censor speech in a designated public forum," but whether Dean Carter was bound to know that the *Innovator* operated in such a forum is a different question altogether.

The district court held that any reasonable college administrator should have known that (a) the approach of *Hazelwood* does not apply to colleges; and (b) only speech that is part of the curriculum is subject to supervision. We have held that neither of these propositions is correct— that *Hazelwood*'s framework is generally applicable and depends in large measure on the operation of public-forum analysis rather than the distinction between curricular and extracurricular activities.

But even if student newspapers at high schools and colleges operate under different constitutional frameworks, as both the district judge and our panel thought, it greatly overstates the certainty of the law to say that any reasonable college administrator had to know that rule. The question had been reserved in *Hazelwood*, and the Supreme Court does not identify for future decision questions that already have "clearly established" answers. See *Wilson v. Layne*, 526 U.S. 603, 614-18 (1999). Post-*Hazelwood* decisions likewise had not "clearly established" that college administrators must keep hands off all student newspapers. As we mentioned in Part II.A, the tenth and eleventh circuits have used *Hazelwood* as the framework for evaluating the acts of colleges as well as high schools. One circuit has said otherwise. See *Student Government Ass'n v. University of Massachusetts*, 868 F.2d 473, 480 n.6 (1st Cir. 1989) (asserting, in sole reliance on *Hazelwood*'s footnote 7, that the Supreme Court itself "holds" that *Hazelwood*'s approach does not apply to post-secondary education). The approach of others is hard to classify. See *Kincaid v. Gibson*, 236 F.3d 342, 346 n.5 (6th Cir. 2001) (en banc) (stating, in reliance on the parties' agreement, that *Hazelwood* has "little application" to collegiate publications but not explaining what this means, or how a constitutional framework can apply "just a little").

This circuit had not spoken on the subject until our panel's opinion, which post-dated Dean Carter's actions.

Many aspects of the law with respect to students' speech,[2] not only the role of age, are difficult to understand and apply, as we remarked in *Baxter v. Vigo County School Corp.*, 26 F.3d 728 (7th Cir. 1994), when holding school administrators entitled to qualified immunity for banning certain message-bearing T-shirts that the elementary-school pupils claimed were protected under *Tinker*. See also, e.g., *Brown v. Li*, 308 F.3d 939 (9th Cir. 2003), in which the members of the appellate panel articulated three distinct and incompatible views about whether *Hazelwood* applies to collegiate settings and how the first amendment affects relations between college faculty and students' expression.

Neither plaintiffs, who have elected to appear *pro se*, nor the *amici curiae* who have ably supported their position in this court, contend that Dean Carter owes damages from her own purse if *Hazelwood* establishes the appropriate legal framework. For reasons that should by now be evident, the implementation of *Hazelwood* means that both legal and factual uncertainties dog the litigation—and it is the function of qualified immunity to ensure that such uncertainties are resolved by prospective relief rather than by financial exactions from public employees. "Qualified immunity shields an official from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau*, 125 S. Ct. at 599. That description is as apt here as it was in *Brosseau*.

Public officials need not predict, at their financial peril, how constitutional uncertainties will be resolved. Disputes about both law and fact make it inappropriate to say that any reasonable person in Dean Carter's position in

November 2000 had to know that the demand for review
before the University would pay the *Innovator*'s printing
bills violated the first amendment. She therefore is enti-
tled to qualified immunity from liability in damages.

REVERSED


EVANS, *Circuit Judge*, joined by ROVNER, WOOD, and
WILLIAMS, *Circuit Judges*, dissenting. In concluding that
*Hazelwood* extends to a university setting, the majority
applies limitations on speech that the Supreme Court
created for use in the *narrow* circumstances of elementary
and secondary education. Because these restrictions on
free speech rights have no place in the world of college and
graduate school, I respectfully dissent.

The majority's conclusion flows from an incorrect prem-
ise—that there is no legal distinction between college and
high school students. In reality, however, "[t]he Court long
has recognized that the status of minors under the law is
unique in many respects." *Bellotti v. Baird*, 443 U.S. 622,
633 (1979). Age, for which grade level is a very good
indicator,[1] has always defined legal rights. As the Court
has noted:

---

[1] According to the U.S. Census Bureau, only about one percent
of those enrolled in American colleges and universities in 2002
were under the age of 18. *See* 2002 U.S. Census Bureau Current
Population Survey (CPS) Rep., Table A-6, "Age Distribution of
College Students 14 years Old and Over, by Sex: October 1947 to
2002."

Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority. Minors, as well as adults, are protected by the Constitution and possess constitutional rights. The Court indeed, however, long has recognized that the State has somewhat broader authority to regulate the activities of children than of adults.

*Planned Parenthood of Missouri. v. Danforth*, 428 U.S. 52, 74 (1976) (internal citations omitted).

This principle is clear with respect to free speech rights, where the Court has delineated a consistent line between high-school-age students and those at the university level. As the Court noted in *Board of Regents of the University of Wisconsin System v. Southworth*, 529 U.S. 217, 238 n.4 (2000), "the right of teaching institutions to limit expressive freedom of students ha[s] been confined to high schools whose students and their schools' relation to them are different and at least arguably distinguishable from their counterparts in college education." (Internal citations omitted.) *See also Healy v. James*, 408 U.S. 169, 180 (1972) ("[T]he precedents of this Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large.").

There are two reasons why the law treats high school students differently than it treats college students, who "are, of course, young adults," *Widmar v. Vincent*, 454 U.S. 263, 274 n.14 (1981): high school students are less mature and the missions of the respective institutions are different. These differences make it clear that *Hazelwood* does not apply beyond high school contact.

It is self-evident that, as a general matter, juveniles are less mature than adults. Indeed, "during the formative

years of childhood and adolescence, minors often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them." *Bellotti*, 443 U.S. at 635. *See also Ginsberg v. New York*, 390 U.S. 629, 649-50 (1968) (Stewart, J., concurring) (footnote omitted) ("[A]t least in some precisely delineated areas, a child—like someone in a captive audience—is not possessed of that full capacity for individual choice which is the presupposition of First Amendment guarantees."). It is this reasoning that dictated the results in *Hazelwood* and *Bethel School District No. 403 v. Fraser*. In *Hazelwood*, the Court emphasized that a different First Amendment standard is appropriate in a high school setting because those students are young, emotionally immature, and more likely to be inappropriately influenced by school-sponsored speech on controversial topics. *Hazelwood*, 484 U.S. at 272. It was, therefore, reasonable to restrict publication of an article about teenage pregnancy. *Bethel School District No. 403 v. Fraser*, 478 U.S. 675 (1986), where the Court permitted a high school to sanction a student for making a lewd student council election speech, makes a similar point. The Court emphasized that "[t]he speech could well be seriously damaging to its *less mature* audience . . . . *Id.* at 683-84 (emphasis added).[2] The same concerns simply do not apply to college students, who are certainly (as a general matter) more mature, independent thinkers. *Tilton v. Richardson*, 403 U.S. 672, 686 (1971), establishes this

---

[2] Other decisions of the Court outside the free speech arena likewise emphasize that greater restrictions are permitted on the rights of juveniles because they are less mature. For example, in *Lee v. Weisman*, 505 U.S. 577 (1992), the Court noted that "there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools." *Id.* at 592.

point. The Court upheld a federal law that provided funding to church-related colleges and universities for construction of facilities for secular educational purposes. The Court noted that pre-college students may not have the maturity to make their own decisions on religion; however, "college students are less impressionable and less susceptible to religious indoctrinations."

Not only is there a distinction between college and high school students themselves, the missions of the two institutions are quite different. Elementary and secondary schools have "custodial and tutelary responsibility for children," *Bd. of Educ. of Indep. Sch. Dist. No. 92 v. Earls*, 536 U.S. 822, 829-30 (2002) (holding that "Fourth Amendment rights . . . are different in public schools than elsewhere"), and are largely concerned with the "inculcation" of "values." *Fraser*, 478 U.S. at 683; *see also Ambach v. Norwick*, 441 U.S. 68, 76 (1979) ("The importance of public schools in the preparation of individuals for participation as citizens, and in the preservation of the values on which our society rests, long has been recognized by our decisions[.]"). A university has a different purpose—to expose students to a "marketplace of ideas." *Keyishian v. Bd. of Regents of the Univ. of N.Y.*, 385 U.S. 589, 603 (1967) (emphasizing that the "Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas . . . ."). *See also Bd. of Regents v. Southworth*, 529 U.S. 217, 231 (2000) ("[R]ecognition must be given as well to the important and substantial purposes of the University, which seeks to facilitate a wide range of speech."); *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 836 (1995) (noting that intellectual curiosity of students remains today a central determination of a university's success and asserting that restriction of that curiosity "risks the suppression of free speech and creative inquiry in one of the vital centers for the Nation's

intellectual life, its college and university campuses");
*Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 312 (1978)
(noting that an atmosphere of "'speculation, experiment
and creation'" is "essential to the quality of higher educa-
tion" (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 263
(1957) (Frankfurter, J., concurring))); *Widmar*, 454 U.S. at
267-68 n.5 ("The college classroom with its surrounding
environs is peculiarly the 'marketplace of ideas.'").

As the Supreme Court perhaps best articulated in *Healy
v. James*:

> [T]he precedents of this Court leave no room for
> the view that, because of the acknowledged need
> for order, First Amendment protections should ap-
> ply with less force on college campuses than in the
> community at large. Quite to the contrary, "[t]he
> vigilant protection of constitutional freedoms is
> nowhere more vital than in the community of
> American schools." The college classroom with its
> surrounding environs is peculiarly the "'market-
> place of ideas,'" and we break no new constitu-
> tional ground in affirming this Nation's dedication
> to safeguarding academic freedom.

408 U.S. 169, 180-81 (1972) (quoting *Shelton v. Tucker*,
364 U.S. 479, 487 (1960), and *Keyishian*, 385 U.S. at 603).
Based on this important notion, I do not believe it is ap-
propriate for this court to extend *Hazelwood* to the college
and university setting.

The majority's holding, furthermore, is particularly un-
fortunate considering the manner in which *Hazelwood* has
been used in the high school setting to restrict controver-
sial speech. *See, e.g., Planned Parenthood v. Clark County
Sch. Dist.*, 941 F.2d 817 (9th Cir. 1991) (holding that the
school district's justification for refusing to publish family

planning advertisements in high school newspapers was reasonable under the *Hazelwood* standard); *Baxter v. Vigo County Sch. Corp.*, 26 F.3d 728, 737-38 (7th Cir. 1994) (upholding the decision of an elementary school principal who prohibited a student from wearing shirts with messages such as "Unfair Grades" and "Racism"); *Poling v. Murphy*, 872 F.2d 757, 764 (6th Cir. 1989) (upholding the decision of a high school administration to exclude a student from a student council race because he made a rude comment about the assistant principal in a speech delivered at a school assembly).

If the plaintiffs' allegations are true, this case epitomizes this concern. The *Innovator*, as opposed to writing merely about football games, actually chose to publish hard-hitting stories. And these articles were critical of the school administration. In response, rather than applauding the young journalists, the University decided to prohibit publication unless a school official reviewed the paper's content before it was printed. Few restrictions on speech seem to run more afoul of basic First Amendment values. First, prior restraints are particularly noxious under the Constitution. *See Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976) ("prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights"); *Near v. Minnesota*, 283 U.S. 697, 713 (1931) ("it has been generally, if not universally, considered that it is the chief purpose of the [First Amendment's free press] guaranty to prevent previous restraints upon publication"). Second, and even more fundamental, as Justice Frankfurter stated (albeit in somewhat dated language) in *Baumgartner v. United States*, 322 U.S. 665, 673-74 (1944), "one of the prerogatives of American citizenship is the right to criticize public men and measures." College students—voting-age citizens and potential future leaders—should feel free to question, chal-

lenge, and criticize government action. Nevertheless, as a result of today's holding, Dean Carter could have censored the *Innovator* by merely establishing "legitimate pedagogical reasons." This court now gives the green light to school administrators to restrict student speech in a manner inconsistent with the First Amendment.

Finally, I disagree with the majority's conclusion that Dean Carter is entitled to qualified immunity. Prior to *Hazelwood*, courts were consistently clear that university administrators could not require prior review of student media or otherwise censor student newspapers. *See, e.g.,* *Stanley v. Magrath*, 719 F.2d 279 (8th Cir. 1983); *Schiff v. Williams*, 519 F.2d 257 (5th Cir. 1975); *Joyner v. Whiting*, 477 F.2d 456, 460 (4th Cir. 1973); *Bazaar v. Fortune*, 476 F.2d 570 (5th Cir. 1973), *adopted en banc in* 489 F.2d 225 (5th Cir. 1973); *Trujillo v. Love*, 322 F. Supp. 1266 (D. Colo. 1971); *Antonelli v. Hammond*, 308 F. Supp. 1329 (D. Mass. 1970); *Dickey v. Alabama St. Bd. of Educ.*, 273 F. Supp. 613 (M.D. Ala. 1967), *vacated as moot sub nom. Troy St. Univ. v. Dickey*, 402 F.2d 515 (5th Cir. 1968); *Panarella v. Birenbaum*, 32 N.Y.2d 108, 343 N.Y.S. 2d 333 (N.Y. 1973); *Mazart v. State*, 109 Misc.2d 1092, 441 N.Y.S. 2d 600 (N.Y. Ct. Cl. 1981); *Milliner v. Turner*, 436 So. 2d 1300 (La. Ct. App. 1983).

*Hazelwood* did not change this well-established rule. So, the question becomes, did anything after *Hazelwood* occur that would suggest to a reasonable person in Dean Carter's position that she could prohibit publication simply because she did not like the articles it was publishing?[3] The answer

---

[3]  Considering that the law was clearly established that college administrators could not control school newspapers, the majority wrongly focuses on the fact that post-*Hazelwood* decisions had
(continued...)

is clearly "no." In fact, a review of the cases, including those the majority relies on, establishes that no case law would have led any reasonable official in Dean Carter's position to believe she had such power.

To begin, both the First Circuit (explicitly) and Sixth Circuit (implicitly) are of the view that *Hazelwood* does not apply in the university setting. In *Student Government Association v. Board of Trustees of the University of Massachusetts*, 868 F.2d 473, 480 n.6 (1st Cir. 1989), the First Circuit held that *Hazelwood* "is not applicable to college newspapers." In *Kincaid v. Gibson*, 236 F.3d 342 (6th Cir. 2001) (en banc), a dispute involving a college yearbook, the court determined that *Hazelwood* had "little application" to the case. *Id.* at 346 n.5. In so noting, the court ruled that the university's yearbook constituted a limited public forum in which content-based regulations were subject to strict scrutiny. The court then held that the administration's decision to confiscate the yearbook, due to unhappiness over its content, violated the First Amendment.

The decisions the majority cites in support of its position, moreover, are inapplicable. *Bishop v. Aronov*, 926 F.2d 1066 (11th Cir. 1991), and *Axson-Flynn v. Johnson*, 356 F.3d 1277 (10th Cir. 2004), both concerned free speech rights *within* the classroom. *Bishop* held that a university could

---

[3] (...continued)

not "clearly established that college administrators must keep hands off all student newspapers." The question is not whether later decisions established that college administrators "must keep hands off," but rather whether later decisions did anything to change the already clearly established rule. In other words, did decisions after *Hazelwood* say anything to suggest that college administrators *could* censor school newspapers.

order a professor to stop interjecting his personal religious
beliefs into his class comments during instruction time.
*Axson-Flynn* held that an acting student at a university
could be required to say script lines that conflict with her
Mormon faith as part of the curriculum. These are very
different situations than free speech rights of student jour-
nalists engaged in an extracurricular activity. Indeed, the
Tenth Circuit recognized such a distinction and explicitly
limited its holding: "We hold that the *Hazelwood* frame-
work is applicable in a university setting for speech that
occurs in a classroom as part of a class curriculum." *Id.*
at 1289. It specifically noted, "We acknowledge that some
circuits have cast doubt on the application of *Hazelwood*
in the context of university *extracurricular* activities.
However, because Axson-Flynn's speech occurred as part
of a *curricular* assignment during class time and in the
classroom, we need not reach any analysis of university's
students' extracurricular speech." *Id.* at 1286 n.6 (em-
phasis added) (internal citations omitted). Finally, I am
hard-pressed to see the relevance of *Settle v. Dickson
County School Board*, 53 F.3d 152 (6th Cir. 1995). That case
concerned a ninth grader who challenged her teacher's
decision not to accept a research paper because it was on
an unapproved topic. Regardless, *Kincaid*, not *Settle*, con-
stitutes the Sixth Circuit's definitive word on the issue.[4]

---

[4] The majority wisely does not, as Dean Carter does, rely on the
Ninth Circuit's decision in *Brown v. Li*, 308 F.3d 939 (2002),
*cert. denied*, 538 U.S. 908 (2003), and the decision of a panel of
the Sixth Circuit in *Kincaid*, 191 F.3d 719 (1999). With respect
to *Brown*, only one judge on the panel, Judge Graber, approved
of the application of *Hazelwood*. Judge Graber, moreover, applied
*Hazelwood* only in the context of a student's masters thesis in-
cluded in the school's curriculum. *Brown*, 308 F.3d at 949. Again,
(continued...)

Therefore, considering that no court, both before or after *Hazelwood*, has held that a university may censor a student newspaper, and the only authorities to suggest otherwise are not directly on point, I believe that it was "clearly established" that the University could not deny funding to the school newspaper it found objectionable.

The majority also states that Dean Carter is entitled to qualified immunity because "A reasonable person in Dean Carter's position was not bound to recognize that the *Innovator* operated in a designated public forum." Although an objective standard, I believe it is noteworthy that, as the district court noted, "Defendants concede that the Innovator serves as a public forum." 174 F. Supp. 2d 782, 786 (N.D. Ill. 2001). A review of the facts, accepting all well-pleaded allegations in the complaint as true and drawing all reasonable inferences in favor of the plaintiff, support Dean Carter's litigation strategy below. Governors State University, by express policy and practice, placed exclusive editorial control of the newspaper with the student editors. Indeed, its own policy stated that the student staff "will determine content and format of their respective publications without censorship or advance approval." The *Innovator* is an independent publication organized and published by students on their own time. The publication is not part of an academic program, but rather an extracurricular activity. The students are provided an advisor, but it is not a class taught by a faculty member, and the advisor did not make any content deci-

---

[4] (...continued)
a very different situation than the one presented here. As for *Kincaid*, that panel decision had already been vacated by the full circuit when Dean Carter restrained publication of the *Innovator*. *See* 197 F.3d 818 (6th Cir. 1999) (vacating panel decision).

sions, only advice was offered. Considering these facts, a reasonable person in Dean Carter's shoes would have believed the *Innovator* operated as a public forum.

In conclusion, because I believe that *Hazelwood* does not apply, no pedagogical concerns can justify suppressing the student speech here. Dean Carter violated clearly established First Amendment law in censoring the student newspaper. I would affirm the judgment of the district court.

A true Copy:

    Teste:

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*